## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>TEODORA PEREZ de TAVAREZ, )<br>ADMINISTRATRIX, ESTATE OF GULLEN )<br>TAVAREZ PEREZ, )<br> )<br>          Plaintiff, )<br> )<br>          v. )<br> )<br>CITY OF FITCHBURG, A MUNICIPAL CORP., )<br>FORMER CHIEF OF POLICE ROBERT A. )<br>DEMOURA, DETECTIVE JOHN E. MAKI, )<br>SGT. TIMOTHY M. McDERMOTT, )<br>SGT. PAUL C. BOZICAS, KEITH C. BOURNE, )<br>CHAD C. CORDIA, and POLICE OFFICER )<br>JOHN DOES 1-3, )<br>          Defendants. )<br>_____ ) | **CIVIL ACTION**<br>**NO. 11-11460-TSH** |

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 48)
### February 6, 2014

HILLMAN, D.J.

Teodora Perez de Tavarez, administratrix of the estate of Gullen Tavarez Perez

("Plaintiff") brings suit seeking damages arising from the death of Gullen Tavarez Perez

("Tavarez Perez"). Plaintiff asserts claims for civil rights violations under 42 U.S.C. s. 1983

against John E. Maki ("Maki"), Timothy M. McDermott ("McDermott"), Paul C. Bozicas

("Bozicas"), Keith C. Bourne ("Bourne"), Chad C. Cordio ("Cordio"), John Does 1-3, the City of

Fitchburg ("Fitchburg"), and Former Chief of Police Robert A. DeMoura ("DeMoura")

(collectively, the "Defendants"). Plaintiff also brought a claim for negligence against Fitchburg

1

and for wrongful death against all Defendants. Defendants now move for summary judgment on all claims. For the reasons set forth below that motion is granted in part, and denied in part

Facts

On Friday August 1, 2008, Maki, a detective of the Fitchburg Police Department, was working with the Northern Worcester County Drug Task Force. The task force officers decided to stop a vehicle they had previously targeted and arrest the occupants. Leominster Detective Siciliano ("Siciliano") and Detective Lieutenant Bernard ("Bernard") of the Gardner Police Department were in a vehicle behind the target car and pulled the target car over. As Siciliano and Bernard approached, Siciliano observed the passenger, Tavarez Perez, "going to his mouth." Maki, in a separate vehicle, had pulled in front of the target car and was walking toward the passenger side of the car. As Maki approached, Bernard was taking Tavarez Perez out of the car. Both Tavarez Perez and the driver, identified as Mario Cleto Rosario ("Rosario") were handcuffed, placed down on the ground in a prone position, and patted down.

Siciliano observed water bottles and an opened clear plastic baggy inside the target vehicle. Siciliano testified that he believed the baggy to be packaging materials for drugs, and that he knew water bottles are one of the signs that drugs are being swallowed for the purpose of destroying evidence. Siciliano formed the opinion that Tavarez Perez had acted to destroy drug evidence. Siciliano did not speak to Tavarez Perez, but stated he "probably" told one or more officers that he believed the Tavarez Perez had swallowed something during the arrest. Siciliano also testified that he thought an ambulance was called for Tavarez Perez.

On the floor of the vehicle's passenger side, where Tavarez Perez had been sitting, Maki observed two bags of white powder consistent with cocaine and another brown powder substance in a plastic bag which he suspected was heroin. Maki also saw a baggie that looked like it had

2

been torn open. He did not observe residue or saliva on any bag that was recovered. Maki asked Tavarez Perez if he swallowed anything and if he wanted to go to the hospital and Tavarez Perez answered no to both. Plaintiff disputes that this happened, and neither Rosario nor Siciliano testified that they heard Maki ask either of these questions.

Maki had previously been involved in an arrest where he had observed the suspect swallow drugs during the arrest and Maki had attempted to extract the drugs by force. The suspect was taken to the Fitchburg Police station where he became ill, was subsequently taken to a hospital, admitted, received medical treatment, and recovered.

Rosario and Tavarez Perez were both arrested for possession of heroin with intent to distribute, possession of heroin, and possession of cocaine with intent to distribute. Neither showed any signs of being under the influence of any substance or being sick during the thirty minutes they were on the scene waiting for transport. They were taken to the Fitchburg Police Department and booked by Bozicas. Around 5:25 pm the same day, Maki wrote a supplemental report of the arrest to go along with an Application for Criminal Complaint against Tavarez Perez. In this narrative, Maki notes that two plastic bags containing cocaine and one plastic bag containing heroin were found at the passenger's feet, and states that "[t]he passenger also swallowed something from another plastic bag when the vehicle was stopped."

After booking, Rosario and Tavarez Perez were placed in separate cells. The cells were separated by a cement wall, so the two men could not see each other, but they were able to speak to each other. The two talked Friday night before they fell asleep. The next morning, Saturday, August 2, a police officer delivered breakfast. Tavarez Perez told Rosario he was not feeling well because the bed hurt to sleep on. At lunch, Tavarez Perez again said he was not feeling well, but did not say why. At dinner, Tavarez Perez told Rosario he was sleepy. Officer Cordio worked as

a dispatcher from 7:00 am to 3:00 pm Saturday. He did not perform any verbal checks, but testified that he observed Tavarez Perez on the cell checks that he is required to perform every 15 minutes by Fitchburg Police Department General Order 86-4. During these cell checks, Cordio looks to see that prisoners are up and about, or, if they are sleeping, he checks for the fall and rise of the chest. Cordio does not recall any observations he made of Tavarez Perez on Saturday.

Cordio again worked as a dispatcher during the 7:00 am to 3:00 pm shift on Sunday August 3, along with Officer Rouleau. Cordio testified he did cell checks during this shift and that Officer Rouleau did as well. There is a camera in each cell which records to a VHS tape. The VHS tape (which was converted to DVD format) from Tavarez Perez's cell shows that beginning at 5:00 am a cell check was not performed every 15 minutes, but was only performed at 5:25 am, 7:00 am, 9:35 am, 10:47 am, and 12:17 am.

Officer Bourne ("Bourne") delivered Tavarez Perez's breakfast Sunday morning and testified that he appeared to be sleeping. When Bourne and Cordio delivered lunch, they saw foam coming out of Tavarez Perez's mouth. Cordio got an Ambu bag and told Rouleau to call an ambulance.

At 4:00 pm on August 3, the hospital contacted Fitchburg Police and told them Tavarez Perez had died from opiate intoxication. The Emergency Department physician Dr. Sebastian noted in the history narrative that "[t]here were reports that the patient may have ingested 2 "8 balls" of cocaine prior to his arrest on Friday (this information was supplied by an individual who was also arrested on similar charges)." The admitting physician, Dr. Aghassi, stated in the history narrative that "[a]pparently, 1 of the witnesses and his friend indicated that he might have

4

consumed balls of cocaine prior to incarceration." An autopsy revealed the presence of three

white bags containing white powder that appear to be tied in Tavarez Perez's stomach.

Trooper Murphy of the State Police investigated the death. Fitchburg Police Captain

Martineau told Murphy that his officers had arrested Tavarez Perez and they suspected that he

had swallowed drugs. The Fitchburg Police Department did not conduct an investigation into

Tavarez Perez's death. The Fitchburg Police Department did not have a policy in effect regarding

the procedure to follow when an arrestee or individual in the custody of the police department is

suspected or known to have ingested drugs.

<u>Discussion</u>

Summary judgment is appropriate when "there is no genuine issue as to any material

fact" and thus "the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the

point in favor of the non-moving party, and a fact is "material" when it might affect the outcome

of the suit under the applicable law.  *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994).

The moving party is responsible for "identifying those portions [of the record] which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1968).  It can meet its burden either by "offering evidence to disprove an element of

the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's

case.'"  *Rakes v. U.S.,* 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 4).

The non-moving party bears the burden of placing at least one material fact into dispute after the

moving party shows the absence of any disputed material fact.  *Mendes v. Medtronic, Inc.*, 18

F.3d 13, 15 (1st Cir.1994) (discussing *Celotex,* 477 U.S. at 325).  When ruling on a motion for

summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).

*Violation of 42 U.S.C. s. 1983 Against Officers Maki, McDermott, Bozicas, Bourne, and Cordio*

*(Counts I and II)*

Plaintiff contends that the above listed officers violated 42 U.S.C. s. 1983 because they knew Tavarez Perez ingested drugs and did nothing, and because the custodial officers failed to properly monitor Tavarez Perez pursuant to their custodial duties. The Fourteenth Amendment places a duty on government authorities to provide pre-trial detainees with the same medical care government authorities are required to give convicted prisoners under the Eighth Amendment. *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990). The Eighth Amendment imposes a duty to attend to a prisoner's serious medical needs. *Id*. "Government officials violate the Constitution if they exhibit 'deliberate indifference' to such needs." *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976)).

To prove deliberate indifference, a plaintiff must show "1) an unusually serious risk of harm… (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *Manarite By & Through Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir. 1992). Proof of deliberate indifference "does not require evidence that officials were aware of the risk of specific harm," but does require evidence that "officials had 'knowledge of facts from which the official[s] can draw the inference that a substantial risk of harm exists.'" *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 157 (1st Cir. 2007) (quoting *Calderon-Ortiz v. Laboy-Alvarado*, 300 F.3d 60, 65 (1st Cir. 2002)). Deliberate indifference "may consist of showing a conscious failure to provide

medical services where they would be reasonably appropriate." *Coscia v. Town of Pembroke, Mass.*, 659 F.3d 37, 39 (1st Cir. 2011).

Here a jury could find that Maki exhibited deliberate indifference to Tavarez Perez's serious medical needs. Maki was aware that swallowing narcotics was dangerous and had previous experience with an arrestee who had swallowed narcotics and had required medical treatment. Maki was aware that suspects swallowed drugs to destroy evidence and avoid arrest and he observed two plastic bags containing cocaine and one plastic bag containing heroin on the passenger side of the vehicle Tavarez Perez was taken from.  Significantly, he stated in his report that "[t]he passenger also swallowed something from another plastic bag when the vehicle was stopped." Siciliano testified that he told Maki that he observed Tavarez Perez motion towards his mouth with one hand. Despite this, Maki did nothing to obtain medical attention for Tavarez Perez. While Maki says he asked Tavarez Perez if he had swallowed anything or needed medical attention, others at the scene, including Siciliano and Rosario, have said they did not hear Maki speak to Tavarez Perez. The facts, taken in the light favorable the Plaintiff, show that Maki knew that there existed a high risk of harm to Tavarez Perez but did nothing to address it, in violation of Tavarez Perez's Constitutional rights.

Maki asserts that he is entitled to qualified immunity. In evaluating claims of qualified immunity, a court must ask "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." *Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 38 (1st Cir. 2007).  The first prong, as explained above, is satisfied. Moreover, the First Circuit has noted that "[i]t is clearly established…that 'jail officials violate the due process rights

of their detainess if they exhibit a deliberate indifference to the medical needs of the detainees."

*Elliott v. Cheshire Cnty., N.H.*, 940 F.2d 7, 10 (1st Cir. 1991) (quoting *Danese v. Asman*, 875

F.2d 1239, 1242 (6th Cir.1989)). Finally, this Court finds that "in light of the specific context of

this case," a reasonable officer in Maki's position would know that not providing medical care to

one who ingested narcotics would be a violation of constitutional rights.  *See Brosseau v.*

*Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004) (noting that qualified immunity inquiry

"must be undertaken in light of the specific context of the case").  Maki knew from previous

experience that the ingestion of narcotics created a serious medical need, and a reasonable officer

with this information would not have ignored this need. Therefore, Maki is not entitled to

qualified immunity, and summary judgment on Count I is denied as to Maki.

There are no facts, nor does Plaintiff make any argument, regarding McDermott having

any knowledge that Tavarez Perez ingested drugs. As there is nothing in the record suggesting

McDermott knew of any risk of harm to Tavarez Perez, summary judgment should be entered in

his favor on Count I.

Similarly, Plaintiff has put forth no evidence showing Bozicas, Bourne, or Cordio had

knowledge of any facts which would cause them to believe a risk of serious harm to Tavarez

Perez existed. Tavarez Perez did not immediately appear intoxicated, these officers were not

present on the scene of the arrest, and there is no evidence that any of these officers were told

that Tavarez Perez ingested narcotics. Plaintiff argues that it is *possible* these officers knew

about the narcotic ingestion because of their access to internal records and because Plaintiff's

expert opined that booking officers are expected to receive a relevant flow of information.[1] This

---

[1] Plaintiff also points to the records from the Emergency Department in which appears someone told the emergency department physician and admitting physician that Tavarez Perez had ingested narcotics. However there is no indication whatsoever that this information came from the custodial officers, or indeed any officers; even Plaintiff asks "Who was the source of this information?" These statements also may be hearsay, though the Court need not

is not enough to show any of these officers had actual knowledge of facts from which they could draw the inference of the risk of serious harm, and thus does not show deliberate indifference on the part of these officers.  *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (Granting summary judgment in favor of officers when detainee died after swallowing drugs, noting "it is not enough for plaintiff to demonstrate a question of fact whether the police officers… should have known that [decedant] had swallowed drugs," rather, evidence must show officers in fact knew).  Even though Plaintiff has presented facts that show the custodial officers likely failed to appropriately monitor Tavarez Perez, without the knowledge of an elevated risk of harm there can be no deliberate indifference. While the failure to monitor may have been negligent and in violation of department policies, it does not rise to the level of a constitutional violation. Therefore summary judgment is granted in favor of Bozicas, Bourne, and Cordio on Count II.

*Violation of 42 U.S.C. s. 1983 for Failure to Train, Discipline, and Supervise (Count III)*

Plaintiff claims Fitchburg and DeMoura, as the policy makers for the Fitchburg Police Department, violated 42 U.S.C. s. 1983 because they knew the risk untreated drug ingestion posed and failed to establish any policies or procedures to deal with such situations. A municipality can be liable under s. 1983 when its agents and employees commit constitutional violations if those constitutional violations arise from a government's policy or custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978).

---

reach that issue at this time.  *Bucci v. Essex Ins. Co.*, 393 F.3d 285, 298 (1st Cir. 2005) ("Under Rule 803(4), there are three requirements for the admission of out-of-court statements: (1) the statements must be made for purposes of diagnosis or treatment (2) about (i) medical history (ii) or past or present symptoms, pain, or sensations or (iii) about the inception or general character of the cause or external source thereof (3) insofar as they are reasonably pertinent to diagnosis or treatment…. Sometimes, when the declarant of an out-of-court statement is unknown, there is less certainty that the statement was made for the purpose of treating or diagnosing the patient, and the statement itself may not bear the indicia of that purpose.").

Liability for a failure to train, supervise, or discipline only rises to the level of a constitutional violation "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir. 1989) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989)).  Similarly, a supervisor can only be held liable if the supervisor is "a primary violator or direct participant in the rights-violating incident" or if he "supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir.1999); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009).  Plaintiffs are also required to show a causal link between a policy, such as the lack of training, and the constitutional harm. *Manarite*, 957 F.2d at 959.

While it is true, as Defendants state, that municipal defendants cannot be held liable under s. 1983 if there is no constitutional violation by the individual defendants, here the Court has found the facts, taken in the light most favorable to Plaintiff, show Maki committed a constitutional violation. The Court must then look to see whether Fitchburg and DeMoura failed to train, supervise, or discipline the Fitchburg police officers with deliberate indifference to the rights of their detainees.

Fitchburg and DeMoura had no policy, written or otherwise, or other training regarding the procedures to follow when an arrestee is known or suspected to have swallowed narcotics at the time of Tavarez Perez's arrest and detention. Fitchburg and DeMoura were aware of the danger of drug ingestion and that it may be successfully medically treated, at the very least because of the Ramirez arrest described above. In this circumstance, the complete lack of any training on how officers should proceed when they know or suspect an arrestee has swallowed

narcotics presents an issue of material fact as to whether Fitchburg and DeMoura were

deliberately indifferent to the rights of their detainees.  *See Blackmore v. Kalamazoo Cnty.*, 390

F.3d 890, 900 (6th Cir. 2004)(reversing grant of summary judgment because "the seriousness of

prisoner's need for medical care is obvious, and because the record presents an issue of fact

regarding the total lack of any County policies, practices, and adequate training for this type of

constitutional claim").  Additionally, there is a question of fact as to whether some measure of

training would have prevented the constitutional harm here.

*State Law Claims*

        Plaintiff has brought claims for negligence (Count VI) and wrongful death (Count V)

against Fitchburg which Fitchburg argues are barred by section 10(j) of the Massachusetts Tort

Claims Act ("MTCA").  The MTCA provides that "[p]ublic employers shall be liable for injury or

loss of property or personal injury or death caused by the negligent or wrongful act or omission

of any public employee while acting within the scope of his office or employment." M.G.L. ch.

258, s. 2.  Section 10(j) of the MTCA states that a public employer cannot be liable for

> any claim based on an act or failure to act to prevent or diminish the harmful
> consequences of a condition or situation, including the violent or tortious conduct
> of a third person, which is not originally caused by the public employer or any
> other person acting on behalf of the public employer.

M.G.L. c. 258 s. 10(j).  Defendants argue that since Plaintiff's state law claims seek to hold

Fitchburg responsible for *failing to prevent* Tavarez Perez's death by opiate ingestion, rather than

for being the original cause, that section 10(j) applies in this case. Section 10(j) "was intended to

provide some substantial measure of immunity from tort liability to government employers."

*Brum v. Town of Dartmouth*, 428 Mass. 684, 695 (1999).  Section 10(j) provides immunity "in

respect to all consequences except where the condition or situation was originally caused by the

public employer." *Id*. at 692.  Here, Fitchburg police officers were not the original cause of the

opiate ingestion which led to Tavarez Perez's death, but allegedly failed to provide medical

services which may have prevented the fatal opiate intoxication.  This neglect of duty is a

"failure to act to prevent or diminish" that excludes liability under 10(j).  *Id.* at 693.

Plaintiff contends that if section 10(j) does apply, then Fitchburg should be still held

liable under either of the two exceptions to section 10(j). Those exceptions state that section 10(j)

shall not apply to

> any claim based upon explicit and specific assurances of safety or assistance,
> beyond general representations that investigation or assistance will be or has been
> undertaken, made to the direct victim or a member of his family or household by a
> public employee, provided that the injury resulted in part from reliance on those
> assurances

or to "any claim based upon the intervention of a public employee which causes injury to the

victim or places the victim in a worse position than he was in before the intervention."  M.G.L.

c. 258 s. 10(j)(1)-(2). The phrase "explicit and specific assurances" "requires 'a spoken or written

assurance, not one implied from the conduct of the parties or the situation,' and the 'terms of the

assurance must be definite, fixed, and free from ambiguity.'"  *Ariel v. Town of Kingston*, 69

Mass. App. Ct. 290, 293, (2007) (quoting *Lawrence v. Cambridge*, 422 Mass. 406, 410 (1996)).

Here there is no evidence of such specific or explicit assurances, nor reliance on any assurances,

making the exception found in section 10(j)(1) inapplicable.  Similarly, Plaintiff has shown no

intervention by Defendants which placed Tavarez Perez in a worse position; rather, Plaintiff's

claims are based on Defendants' failure to intervene. The City is therefore immune from the state

law claims (Counts V and VII) under M.G.L. c. 258 s. 10(j).

The s. 10(j) exception to tort liability causes a particularly harsh result in the

circumstances of this case. In the light most favorable to Plaintiff, one police officer saw the

decedent swallow drugs and another commented on it in his police report authored the day of the

arrest. While these facts may give rise to viable constitutional claims, s. 10(j) makes a dog's breakfast out of any claim for relief on a negligence theory and leaves to Plaintiff the burden of proving the more difficult elements of a constitutional violation. Municipal police officers may fail, whether intentionally or through misfeasance, to assist a prisoner with medical needs without fear of common law negligence consequences. I share Justice Fried's frustration with the statute, and with its practical application in situations such as this.[2]

Plaintiff also brought a claim for wrongful death against all Defendants. Fitchburg is immune from this claim, as explained above. The remaining Defendants are also immune under M.G.L. c. 258 s. 2 which provides that a public employee is not liable for "personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment."  Defendants are therefore entitled to summary judgment on Counts IV and V.

## Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 48) is ***granted*** in part and ***denied*** in part. Summary judgment is granted in favor of McDermott on Count I and in favor of all applicable Defendants on Counts II, IV and V, and is denied as to Maki on Count I and all applicable Defendants on Count III.


SO ORDERED.

/s/ Timothy S. Hillman
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE

---

[2] In *Brum*, Justice Fried noted that the  s. 10(j) "language is convoluted and ambiguous, as evidenced by the difficulty Superior Court judges have had in applying it and the inconsistency of outcomes." He also expressed sympathy with the observation made by the concurrence.  248 Mass. at 692, 708 n.17.  Justice Ireland, writing the concurring opinion joined by two other justices, stated that while the Court was "constrained by the words of the statute," the resultant finding that the defendants had immunity under s. 10(j) was "unfortunate" and that the "practical effect of [the] ruling [was] wrong." *Id*. at 708 (Ireland, J., concurring).